RICO ARGENTINE MINING CO., a Utah corporation, Plaintiff,

v.

The BOARD OF COUNTY COMMISSIONERS OF DOLORES COUNTY, COLORADO, and E. E. Ballenger, Oscar P. Dressel and Waldo T. Vinger as Commissioners thereof, Defendants.

Civ. A. No. 6973.

United States District Court
D. Colorado.

March 13, 1963.

Milenski & Parga, Cortez, Colo., for plaintiff.

Crisjohn & Dyer, Cortez, Colo., for defendants.

DOYLE, District Judge.

I. *The Pleadings and Issues.*

■ The action herein is instituted pursuant to Title 28 U.S.C. § 1332(a) (1) seeking refund of ad valorem taxes paid to the County of Dolores under protest. The substantive remedy here invoked is a Colorado statute which authorizes in certain limited circumstances an action against the County to obtain refund of the taxes paid. This section, C.R.S.1953, 137–12–15 (Perm.Supp. 1960), [1] renders the County responsible for refund where the taxes are illegal, erroneous, or illegal due to erroneous assessment, improper levying, or clerical error. It may well be that plaintiff seeks other equitable or declaratory relief and if so this court is precluded from entertaining any such demands. Title 28 U.S.C. § 1341; see Central Steel & Wire Co. v. Detroit, 101 F.Supp. 470 (E.D.Mich.1951). It is plaintiff's contention, as expressed in its pleadings and in the evidence, that the taxes for the years 1959 and 1960 must be determined to be erroneous or illegal because of erroneous assessment. At least some of the assessments, so it is claimed, were processed invalidly. In other instances the contention is made that the valuations are so grossly excessive as to be confiscatory, while in still others it is complained that the discrimination was gross and palpable whereby the assessments were in contravention of due process and equal protection of the Fourteenth Amendment, Constitution of the United States.

The amended complaint consists of four claims which describe plaintiff's

---

1. This provision is in pertinent part as follows: "(2) In all cases where any person shall pay any tax, interest, penalty, or other charge, or any portion thereof, which thereafter shall be found to be erroneous or illegal, whether the same be due to erroneous assessment, to improper or irregular levying of the tax, or to clerical or other errors or irregularities, the board of county commissioners or other body authorized to levy county taxes, shall refund the same without abatement or discount to the taxpayer.

contentions, at least to some degree. *Count One* seeks refund of taxes for the year 1959 on the basis that the assessment was actually made by the Board of County Equalization rather than by the assessor. Other allegations in this count are that the assessments which the assessor did make in 1959 were discriminatory and excessive. *Count Two* also challenges 1959 taxes and alleges that the assessor illegally classified iron pyrite as a valuable mineral whereas the relevant statute[2] dealing with valuable minerals does not encompass pyrite; that this was assessment in excess of jurisdiction. The *third count* alleges failure of the assessor to mail to the taxpayer a notice of increase in valuation as required by statute (C.R.S.1953, 137–3–37). It is said that this statement must be mailed before July 1 of the assessment year; that plaintiff's assessment was substantially higher in 1959, but it received no notice; that this failure constituted deprivation of procedural due process and prevented effective exercise by plaintiff of its statutory remedies; that in consequence the assessments were all palpably excessive and disproportionate, discriminatory, and violative of Fourteenth Amendment guarantees.

The remaining count (*Count Four*) pertains to 1960 taxes. It sets forth five grounds showing illegality: (a) failure of the assessor to mail the statutory notices of the increase in the 1960 assessments; (b) assessment by the assessor of pyrite based on the value of the ore produced; (c) arbitrary, unfair, unjust and disproportionately high assessments compared with similarly situated property; (d) denial of the right to be heard before the assessor and Board of County Equalization; and (e) no plain, speedy and efficient remedy in the courts of Colorado. Judgment is prayed in the amount of $53,089.61 (the amount of its 1959 taxes); a declaration that the 1959, 1960 assessments were void; a judgment that the 1960 assessment was manifestly erroneous and oppressive; a determination

of an equitable tax base; determination that mining properties are not taxable as producing properties.

The amended answer consists of a general denial, failure to state a claim, statute of limitations, improper venue, laches, and failure to exhaust statutory remedies. Defendants also interpose a plea of *res judicata* based upon 1960 proceedings before the Supreme Court of Colorado in which that Court is said to have had all of the present issues before it in a proceeding on an extraordinary writ.

In reply plaintiff pleads a *nisi prius* decision of the District Court for Dolores County rendered in 1962 as *res judicata* of the present issues.

Defendants have moved to dismiss at every stage of the proceedings on the grounds generally described in the answer to the amended complaint. It has been, however, impossible from the pleadings alone to assay the plaintiff's claims, and it is not now possible to glean from the assertions contained in them whether there is merit such as can be properly considered in these extraordinary proceedings. Consequently, it was deemed necessary to hear evidence, at the same time reserving defendants' rights, and it is now essential to review the facts so that they may be carefully tested in the light of the applicable law. The substantive facts, such as comparative value of the properties in question, are in sharp and sometimes bitter dispute. This is not true of some of the basic and procedural facts. As to the latter, there has been a stipulation which furnishes considerable insight to the nature of this controversy. These matters (which were reduced at the pre-trial conference) are as follows:

II. *The Facts as Stipulated or Found.*

"Plaintiff is a Utah corporation, organized in 1911 and commenced lead, zinc, gold and silver mining operations in and about the town of Rico (about 400 to 500 people),

2. C.R.S.1953, 137–5–2.

Dolores County, Colorado. In 1937 a 150-ton flotation mill was constructed at a cost of approximately $94,000.00. The defendants are all citizens of the State of Colorado, constituting the membership of the Board and taxing district for Dolores County, State of Colorado.

"Plaintiff owns real and personal property in Dolores County, Colorado, all of which is subject to taxation by Dolores County and plaintiff paid, under protest, Dolores County the real and personal taxes for the years 1959 and 1960. In 1955 plaintiff constructed and put into operation a 150-ton acid plant. Plaintiff, in 1956, constructed and put into operation a benefication (sic) plant at a cost of approximately $65,000.00.

"Plaintiff during the years 1952 to 1954 renovated an existing building and constructed a movie house and cafe.

"In 1959 the County Assessor did not mail any notice of the proposed increase in assessed valuations of plaintiff's Dolores County properties, but the assessed valuation on some, not all, of plaintiff's properties was increased in the year 1959.

"Plaintiff did appear at a meeting of the Board of County Commissioners sitting as a Board of Equalization in July of 1959 and did not protest by any verified petition or other document to the Board of Equalization of Dolores County, Colorado, wherein they described any property claimed to be unjustly or erroneously assessed, the sum at which it was assessed, its true cash value, what a just assessment on any such property might be as compared with other like property, and written grounds of the refusal of the Assessor to make an adjustment in the assessed valuations for either 1959 or 1960.

"Plaintiff did not appeal the decision of the Board of Equalization in 1959 to any District Court on or before the first Monday in January, 1960.

"Sherman B. Hinkley was, on February 1, 1959, and continues to this day as President and General Manager of Plaintiff Company.

"Robert W. Bengtzen was, on February 1, 1959, and continues to this day as Comptroller of Plaintiff Company.

"Plaintiff made its first objection to the assessment of its properties located in Dolores County, as made by the County Assessor for the year 1959, in the office of the County Assessor at Dove Creek, Colorado, on July 29, 1959.

"The County Clerk of Dolores County gave notice by publication at least ten days prior to the meeting of the Board of Equalization on the third Monday in July, 1959, to-wit: July 20, 1959.

"The Board of County Commissioners of Dolores County, Colorado, sitting as a Board of Equalization, met pursuant to said notice and publication at the office of the Dolores County Clerk in Dove Creek, Colorado, on July 20, 1959.

"In Plaintiff Company's report to stockholders for 1958, Sherman B. Hinkley stated, 'A total of 52,985 dry tons of pyrite was mined.'

"In Plaintiff Company's report to the stockholders for 1959 Sherman B. Hinkley stated, 'Of the 37,950 tons of pyrite mined for the acid plant during the year * * *.'

"In Plaintiff Company's report to stockholders for 1958 Sherman B. Hinkley stated, 'The acid plant produced 46,646 tons of 100% basis of commercial sulphuric acid during the year.'"

As indicated above, the assets of plaintiff consist of mining claims, both patented and unpatented, located in and around the entire area of the town of Rico. The mineralization consists largely of lead and zinc and some traces, at least, of gold and silver. In addition,

there are unusually extensive deposits of iron pyrite. There are various buildings designed to service the claims. There is a flotation mill, an elaborate acid plant, a building which houses a cafe and theatre, an old two-story building which is used as an office building, a hotel which is described as a converted bunk house. There are numerous company houses which are rented to the employees and which are only partially occupied. There is also much equipment, consisting of compressors, and machinery, and somewhat elaborate workings, a large tunnel, the St. Louis, and extensive underground development. The important mining claims are the Mountain Springs, Argentine, and in addition the St. Louis group of claims. The mineralization in the area consists of veins which vary in thickness from two feet to thirty-two feet. These are irregular not only in thickness but in length as well. The various claims differ in value according to the mineralization and accessibility. Some are held only for the purpose of preventing encroachment, and others are held only to provide surface and subsurface accessibility. The claims are situated at altitudes ranging from 8800 feet to 12,500 feet. The plaintiff owns extensive non-producing claims in and around the town of Rico which are comparable in character to claims owned by others. These are close to and sometimes contiguous to claims owned by others, and plaintiff's claims have been uniformly assessed at $25.00 per acre as compared with much lower assessments, for example, $15.00 per acre applied to claims owned by others.

Prior to 1954, 1955 plaintiff's operation would appear to have been limited to lead and zinc mining. But in those years the emphasis shifted to production of pyrite and the manufacture of sulphuric acid. At first the mine dumps and tailing ponds were used as a source of iron pyrite but when usable supplies from these sources were exhausted, the actual mining of pyrite as such was undertaken. The acid plant which was first built in 1954–1955 actually burns pyrite so as to produce

sulphur dioxide gas which is in turn processed into sulphuric acid. The mill was designed and constructed on the premise that it would produce not less than 150 tons of acid per day and possibly as much as 200 tons per day. Due to the nature of the operation, equipment is quickly worn, corroded, or eroded. Actual production has steadily diminished since the plant was built from a high production of 186 tons per day in March of 1956 to less than 150 tons per day in 1959. Repair and replacement costs are exceedingly high. The annual report of plaintiff for 1958 shows 52,985 tons of pyrite mined, and 46,646 tons of acid produced. For 1959 it was 37,950 tons of pyrite and 39,529 tons of acid.

Lead and zinc mining continues to be an important part of plaintiff's operation. The annual report for the year ending June 30, 1960 disclosed that the Mountain Springs claims produced 8,465 tons of lead-zinc ore, and that the Argentine produced 6,188 tons of this ore. There was a total of 38.95 ounces of gold shipped and 44,356 ounces of silver. The quantity of lead realized was 1,709,292 pounds of lead, and 101,683 pounds of zinc.

Plaintiff's total assessed valuation in 1958 was $859,785.00. In 1959, however, this valuation was increased to $900,901.-35. There was no formal notice of this increase. Nevertheless, in July 1959, plaintiff through its president, Mr. Hinkley, and its comptroller, Mr. Bengtzen, had several conferences with the assessor in his office at Dove Creek, Colorado. These conferences were, according to plaintiff's testimony, for the purpose of protesting the 1958 assessment of their acid plant. During these conversations they learned for the first time that their assessments were being increased. After going over the figures with the assessor they asked what they could do about it and were told that they could protest the figures before the Board of Equalization which was meeting that same day.

On the occasion of meeting with the assessor he had not then determined a value for the iron pyrite and the non-producing

claims, but he did then indicate that these items would be assessed. They received assessment lists which did not include the pyrite or non-producing claims. The assessor did not on that occasion furnish a written refusal or rejection of protests. Following these discussions with the assessor, plaintiff's officers then appeared before the County Board of Equalization and protested the increases item by item.

According to plaintiff the first detailed notice as to the amount of assessment for the year 1959 was received on July 1, 1960. It was then notified that iron pyrite would be assessed at $7.00 per ton, or a total of $64,745.00. The non-producing mines were valued at $25.00 per acre as compared with assessment of producing mines consisting of 738 acres at $10,760.00 or, roughly $14.00 per acre. However, a resolution of the County Board dated July 28, 1959 directed that pyrites be assessed and that non-producing as well as producing claims also be assessed. The figures were a matter of public record no later than September 3, 1959, at which time the abstract was filed with the Tax Commission.

Voluminous testimony to show excessiveness and disproportionateness of the valuations was offered by plaintiff. Their movie theatre and cafe was shown to have been valued at $19,145.00 as compared with a commercial theatre at Dove Creek which was shown to have been assessed in the amount of $7,335.00.

Mr. Hinkley testified at length, comparing company houses and valuations with similar housing of others. He showed that in each instance the company houses were assessed substantially higher than the assessment on comparable housing. The hotel and office building were described as old buildings having a limited use and little, if any, sale value. The theatre was explained as existing not for profit but as a recreational area and the value given it was said to be clearly excessive.

The method employed in the valuation of the acid plant together with the result reached was subject to extensive testimony on both sides. The valuation placed on it for assessment purposes was approximately $500,000.00. Plaintiff maintained that this was in excess of its true cash value, and thus palpably in excess of the one-third of true cash value which the assessor maintained that he tried to achieve uniformly on all property. Experts, some of whom were not familiar with market value of such a plant but who had familiarity with the complexities and expense incident to building and maintaining such a plant, testified and offered opinions. It appeared, however, that the assessor not having any similar property or properties for comparison purposes, had under the supervision of the Colorado Tax Commission looked to original costs less depreciation and obsolescence. Original cost plus additions was well in excess of $2,000,000.00. But some items, such as the beneficiation plant was given a value though it had fallen into disuse.

The alleged procedural deficiencies are for the most part contained in the agreed statement of the facts, or have already received mention. Much is made of the fact that the assessor failed to give plaintiff notice of increase in its total assessment prior to July, 1959. It is to be noted that there was a lack of effort on the part of plaintiff to furnish information. Plaintiff's attitude was one of allowing the assessor to get it for himself. This may have been due to a lack of rapport between the assessor and plaintiff which plaintiff maintains was due to their having fired him some years before when he had been an employee. Regardless of plaintiff's view on this, personal animosity is not shown to have entered into the assessments in question. It is not shown that plaintiff lacked actual notice which interfered with effective pursuit of the remedies provided by statute. Officers of plaintiff knew in July of 1959 of the increases and of the assessment of non-producing claims and of pyrite, and there is not any indication that plaintiff failed to protest. On the contrary, there was ample discussion and protestation.

The nature of plaintiff's contentions are now generally apparent. In the interests, nevertheless, of clarity, these can be summarized as follows:

### III.  *Plaintiff's Contentions.*

I.  Iron pyrite was assessed as a precious metal under the statute pertaining to producing mines, and this action of the assessor and of the board was illegal.

II.  The assessor failed to give notice of increase of total assessment, particularly the addition of pyrite and of nonproducing claims to the assessment roll which rendered his action illegal.

III.  The assessor failed to provide written reasons for disallowance of protests which rendered his action erroneous or illegal.

IV.  There was gross over-evaluation of plaintiff's property and palpable discrimination and such excessiveness rendered the valuations unconstitutional.

V.  The assessment was actually made by the Board of Equalization rather than by the assessor, and this fact rendered the assessment invalid.

Although plaintiff's points will be discussed, it is not deemed necessary to pursue them in the above order.

### DISCUSSION AND CONCLUSIONS

A.  Whether Defendant Exhausted its Administrative Remedies.

It is undisputed that plaintiff failed in both 1959 and 1960 to appeal the actions of the assessor and of the County Board of Equalization to the District Court of Dolores County as provided in C.R.S.1953, 137–3–37, 38.[3]  Reading sections 137–3–37 and 137–3–38 together it must be concluded that an elaborate and meaningful method for testing excessive assessments has been provided. In section 137–3–38, supra, the taxpayer must specify the overevaluation, and must tender what he regards as a proper valuation.  This allows a more knowledgeable hearing than could be ever possible under the procedure which is now being invoked, that is section 137–12–15. Unquestionably, the Colorado General Assembly did not intend to create alternative remedies, and the only logical basis for reconciling them is on the ground that the General Assembly intended that section 137–12–15 be used only after full exhaustion of state remedies or otherwise only if voidness arising from illegality could be shown.  The Colorado Supreme Court has sharply distinguished the remedies arising under section 137–3–38 and those under 137–12–15 and has refused to allow demands of over assessment or over evaluation to be raised under the latter.  City and County of Denver v. Athmar Park Building Co., Colo., 378 P.2d 638; Simmons v. Board of County Commissioners, 146 Colo. 392, 361 P.2d 769 (1961); Miller v. Board of County Commissioners, 92 Colo. 425, 21 P.2d 714 (1933).  These cases hold that excessive valuations must be challenged by exhaustion of administrative remedy in the manner set forth in sec-

---

3.  "In all cases where the prayer of such petitioner be denied, in whole or in part, by the county board of equalization, the petitioner may appeal from the decision of the board to the district court of the county wherein said property is assessed. Such appeal shall be taken on or before the first Monday in January following said assessment and shall be perfected in the same manner within the extended time herein stated as is now provided by law for appeals from the board of county commissioners upon disallowance of claims against the county; but before the appeal to the district court shall be allowed, the petitioner shall pay to the county treasurer the amount of the tax levied pursuant to said assessment.  In case the appellant shall succeed in the district court, in whole or in part, according to the modification so made, upon the presentation to him of a certified copy of the order of the judgment, modifying same and in all cases where any tax so collected shall be refunded, the taxpayer shall receive interest on the amount refunded at eight per cent per annum, from the time of the payment thereof; provided, however, that the court shall not review, or give relief against an assessment merely because excessive, unless it shall appear manifestly fraudulent, erroneous or oppressive.

tion 137-3-38. It is, of course, conceivable that the assessments could be called into question regardless of exhaustion of remedy if so excessive as to be without a basis or so lacking in equality of classification or treatment as to be violative of the Constitution. The plaintiff's burden is different and much greater in the present proceeding than in an appeal from the Board to the State Court. Here the attack is collateral, and this usually requires proof that the proceedings were void for lack of jurisdiction or for action beyond the law. Most of the plaintiff's case is thus barred at the threshold.

B. The Question Whether the Assessments are Unconstitutionally Excessive.

■ Is it possible for assessments to be so palpably excessive as to violate the Constitution and thus be subject to collateral attack in a proceeding under Section 137-12-15, supra? and if so, has the plaintiff sustained the burden of establishing a right which can give rise to an adjudication of voidness on this ground?

The defendants take the position that all excessive valuations must be pursued by administrative appeal in the Colorado District Court in accordance with C.R.S. 137-3-38; that this would be true regardless of allegations of unconstitutionality of the valuations. Neither Simmons, supra, nor Athmar, supra, nor the other decisions of the Colorado Supreme Court have so held. On the other hand, these pronouncements furnish no comfort to the defendants. They positively hold that excessive assessments do not give rise to a remedy under Section 137-12-15. It may be unnecessary to draw lines of demarcation in the present case since the facts here considered in the light of the authorities fail to establish that the assessments are unconstitutional. Nevertheless, it is necessary to examine the decided cases in search of controlling criteria.

A definitive decision of the Supreme Court involving the statutes of Colorado is First National Bank of Greeley v. Board of Commissioners of Weld County, 264 U.S. 450, 44 S.Ct. 385, 386, 387, 68 L.Ed. 784 (1924). As in the case at bar the allegation was violation of equal protection and due process of the Fourteenth Amendment. The assessor had fixed the value of the shares of the plaintiff bank at full cash value, whereas the property of other taxpayers in the county had been fixed at 61 per cent. for 1913 and 80 per cent. for 1914. As in the present case the suit sought recovery of taxes paid under protest, but there the plaintiff had failed to protest the assessments before any of the taxing authorities. The Supreme Court carefully analyzed the pertinent statutes which were substantially similar to the present provisions, and said:

"We are met at the threshold * * * with the contention that the plaintiff did not exhaust its remedies before the administrative boards and consequently cannot be heard by a judicial tribunal to assert the invalidity of the tax. We are of opinion that this contention must be upheld."

The Court then concluded:

"Plaintiff not having availed itself of the administrative remedies afforded by the statutes, as construed by the state court, it results that the question whether the tax is vulnerable to the challenge in respect of its validity upon any or all of the grounds set forth, is one which we are not called upon to consider. The judgment of the District Court is accordingly affirmed."

To the same proposition as First National Bank of Greeley is South Broadway National Bank v. City and County of Denver, 51 F.2d 703 (10 Cir., 1931). There also it was concluded that overvaluation could not be asserted in an action to recover taxes paid under protest where there had not been observance of statutory remedies. In commenting on the Greeley case, the Court of Appeals said:

" * * * It was claimed that the taxes were excessive, discriminatory and violative of said section 5219 in

that they were assessed at a higher valuation than other property. It was there held that the plaintiff could not maintain its action, having failed to avail itself of the administrative remedy afforded by the state statute. * * * "

There are numerous decisions illustrating excessive assessments which like the cases cited above hold that the plaintiff has not established illegality or erroneousness. There is a surprising dearth of holdings that over-assessment is susceptible to the kind of attack which is here mounted. One such case which suggests support to plaintiff is Great Northern Ry. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 435, 80 L.Ed. 532 (1936); Stone, Brandeis, and Cardozo, JJ., dissenting. The true rule was well expressed in the dissenting opinion of Mr. Justice Stone, as follows:

"Assessment for taxation is a quasi-judicial act and the tax assessment has the quality of a judgment. [Citing cases] Even if the valuation of the Board be erroneous, the errors of a state judicial officer, however gross, whether of law or of fact, are not violations of the Constitution and are not open to review in the federal courts merely because they are errors. If overvaluation, even though gross or intentional, were, without more, held to infringe the Fourteenth Amendment, every taxpayer would be at liberty to ask the federal courts to review a state tax assessment upon the bare allegation that it is grossly excessive, and without showing that it does more than subject him to taxation on the same basis as every other taxpayer."

Noteworthy is the fact that the majority ruling to the effect that failure to notice losses occasioned by the depression as a shrinking factor in the valuation of a railroad's capital was erroneous. Nevertheless, the majority recognized the general rule as to exhaustion of remedies and the decision has been subsequently limited to its facts by Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 60 S.Ct. 968, 84 L.Ed. 1254 (1940). The facts of the case at bar are not in any event comparable to Great Northern wherein there was a sharply defined deficiency in the assessment process which lent force to the allegation of illegality.

We must seek out decisions from other jurisdictions in order to discover a criterion which might prove helpful in solving the instant case. Thus, in Adams County v. Northern Pacific Ry. Co., 115 F.2d 768 (1940), the Court of Appeals for the Ninth Circuit said:

" * * * Broadly speaking, these values are conclusive upon the court and cannot be changed by the court by injunction or otherwise unless the value thus fixed is so excessive and arbitrary as to evidence actual fraud or constitute constructive fraud in fixing such valuations. This has long been and still is the rule followed by the Supreme Court in dealing with cases in which it is charged that a tax imposed by state authority is so excessive as to violate the due process clause of the Fourteenth Amendment to the constitution of the United States. * * * "

And in Lehigh Valley Ry. Co. of New Jersey v. Martin, 100 F.2d 139, the Court of Appeals for the Third Circuit expressed a somewhat similar test as follows:

" * * * The courts may not interfere with the collection of rates established under legislative sanction unless their enforcement is the equivalent of taking property without compensation. * * * It is necessary that the appellants show that the assessments were fraudulently made or were so wrong in principle as to constitute a taking of property without due process. The assessments must be such as to constitute not an exercise of the taxing power, but to be in reality confiscation."

It is thus seen that the only possible basis for recognition of plaintiff's prem--

ise is the presence of actual or constructive fraud; or—as stated in Lehigh Valley, supra, confiscation.

Has plaintiff proven by a preponderance of the evidence that the assessments here in question were of this character? Plaintiff's own evidence shows that much of its property was valued at 50 per cent. of true cash value as compared with 30 and 35 per cent. applied to similar property in the area. In the instance of the acid plant plaintiff's value evidence is unsatisfactory, but if it is believed it would show that the $500,000.00 assessment is perhaps 50 per cent. in excess of actual cash value. In the case of the non-producing patented mining property it is to be discerned that property of others in the area is valued at a maximum level of $20.00 per acre, whereas the value placed upon plaintiff's similar claims was $25.00 per acre. The values given to the houses and other improvements seem high, but not unconscionably so.

Fraud, actual or constructive, is not apparent in any of these conclusions, and when it is balanced by the evidence offered on behalf of defendants, the Court is left with a conclusion merely that reasonable minds have arrived at different determinations. Certainly, the fact that this Court would have struck some intermediate mean does not spell out illegality. This Court is in a peculiarly poor position to second-guess the assessor. This proves the wisdom of the requirement that the plaintiff pursue and exhaust all statutory remedies. The State has established an elaborate and fair system for determining questions such as the present one. See First National Bank of Greeley v. Patterson, 65 Colo. 166, 176 P. 498, 499 (1918). To hold in this case that he was wrong would not only be presumptuous—it would undermine the entire system.

C. The Procedural Complaints.

1. *Failure to Give Notice.*

It is undisputed that the assessor in the year 1959 did not send the notice required by C.R.S. 137–3–37, but plaintiff fails to show prejudice resulting therefrom. That it had actual notice is shown by the fact that it appeared before the assessor and the Board through its officers and made vehement protests. Furthermore, plaintiff *did* receive notice of the actions which were taken by the County Board. In the year 1960 notice was given in accordance with the statute so there is no problem here.

The question thus resolves itself as to the effect of failure to give notice by itself. On this, Gale v. Statler, 47 Colo. 72, 105 P. 858 (1909), holds that notice is essential where the taxpayer is deprived of the right to be heard. Where, as here, there is no prejudice, the failure to comply with formal statutory requirements cannot be asserted as error. See Citizens Committee for Fair Property Taxation v. Warner, 127 Colo. 121, 254 P.2d 1005 (1953). In Northcutt v. Burton, 127 Colo. 145, 254 P.2d 1013 (1953), the Colorado Supreme Court said:

"These statutory requirements are to be construed as mandatory only in specific instances where, upon clear showing on behalf of the aggrieved taxpayer, that, on account of noncompliance with these statutory requirements by the county officials charged therewith, he has been deprived of an 'opportunity for a hearing, or for any other purpose important to him.'"

In view of the above it is not possible to conclude that the defect here complained of was so gross as to render the entire tax illegal.

2. *The Contention that the Assessment was made by the Board of Equalization rather than by the Assessor.*

The testimony established that the assessor, despite the contentions of plaintiff, made the assessment, and in directing that deficiencies be supplied the Board was merely performing its duty under section 137–8–1 which declares: "The board shall notify the assessor to supply any omissions in the assessment roll, which may come to their notice."

The action of the Board was within its authority as granted by section 137–8–1; therefore, this contention is without merit.

### 3. *Failure to give Written Reasons for Disallowance.*

■ The failure of plaintiff to show that it was prejudiced by the assessor's not providing written reasons, also renders this alleged error insufficient. There were ample communications between the assessor and plaintiff and between the Board and the plaintiff, the result of which was that plaintiff could have pursued its remedies to the district court had it been desirous of doing so. In this connection, it is to be noted that plaintiff had failed to furnish inventories and other information and, therefore, it is not in a good position to demand strict compliance with related procedural requirements.

### D. Validity of the Iron Pyrite Assessment.

■ Plaintiff's contention is that "iron pyrite was assessed under the method used for valuable minerals, which assessment is illegal and therefore void." The argument is that pyrite is neither a precious nor a valuable mineral as those terms are used in the statutes and should,

therefore, have been assessed as nonproducing mines pursuant to C.R.S. 137–5–9.[4] It is said that iron pyrite falls logically within the classification "of iron, coal, asphaltum, quarries and lands valuable because containing other metals or earths." The pyrites were assessed pursuant to sections 137–5–2, 137–5–3,[5] which section classifies valuable mineral producing properties naming gold, silver, lead, copper or other precious or valuable minerals. Defendants maintain that since the pyrite occurs in a vein which includes gold, silver and lead, it is part and parcel of the precious metal classification. Thus, if the plaintiff is correct in its claim that the assessment proceeded under the wrong statute, it is in truth an illegal or erroneous assessment and subject to adjudication as such in these proceedings.

There is no adjudication of the Supreme Court of Colorado construing the statutes in question in the light of facts like the present ones. The only decision of that court which comes close to the present issues is Foster v. Hart Consol. Mining Co., 52 Colo. 459, 122 P. 48 (1912). In upholding the statutory classification, the Court said:

"The act is also attacked upon the ground that section 5625 does

4. Section 137–5–9. "The manner of assessment and taxation in section 137–5–4 shall apply only to mines and mining claims bearing and producing gold, silver, lead, copper or other precious or valuable metals or minerals, and shall not be construed to apply to mines of iron, coal, asphaltum, quarries and lands valuable because containing other metals, minerals or earths, all of which shall be assessed and taxed like other property, according to the value thereof. All mines or mining claims or possessory rights therein that are not producing gold, silver, lead, copper or other precious or valuable metals or minerals shall be assessed and taxed like other property, according to the value thereof, and in ascertaining such value the assessor, in addition to the other requirements of this chapter, shall take into consideration the location thereof, the proximity to other mines or mining claims and any other matters which may tend to assist him in arriving

at a fair and equitable valuation of such property. Nothing contained in this chapter shall be construed as giving the assessor any right to assess a nonproducing mining claim at a greater sum per acre than is assessed per acre against the lowest producing mine or mining claim situated in the same locality."

5. Section 137–5–2. "All mines and mining claims bearing gold, silver, lead, copper or other precious or valuable minerals and possessory rights therein are hereby, for the purpose of assessment for taxation, divided into two classes: producing and nonproducing."

Section 137–5–3. "All mines and mining claims whose gross production shall exceed five thousand dollars in dollars and cents per annum shall be classed as producing mines, and all others shall be classed as nonproducing mines."

Section 137–5–4 provides the method of assessment of producing mines.

not apply to mines of iron, coal, quarries, and lands containing other metals, minerals, or earths not classed as precious, and therefore discriminates in favor of one class of mining properties as against others. There is a reason for the exemption of quarries and mines of coal and iron. Deposits of this character usually exist in such quantities, and are generally of such uniformity throughout an extended area that it is not difficult to determine their value. With respect to ores carrying the precious metals, experience has established the converse. The veins are usually small, often ill defined, irregular, uncertain in extent, and distributed through masses of barren rock, so that their values cannot be ascertained with any reasonable degree of certainty until mined."

A recent decision of the District Court of Dolores County involving the parties who are here present considered this identical question in connection with the 1961 taxes of the plaintiff. That court found: (Civil 983, pp. 6, 7)

"That the Company's objection to the assessor's method of assessing pyrite is valid. Sections three, four and nine of Chapter 137 Art. 5, 1953 CRS clearly limit and define a producing mine to ore whose gross production exceeds Five Thousand Dollars and whose mineral content bears gold, silver, lead, copper, or other precious or valuable minerals. Section nine specifically excludes mines bearing iron, coal, asphaltum, quarries, and lands valuable because of containing other metals, minerals or earth.

"That pyrite is neither a precious nor valuable mineral as those terms are used in the statutes and should therefore have been assessed as nonproducing mines under the provisions of 137-5-11."

The court went on and demonstrated that the assessor had not even properly assessed the property as a producing mine but this dictum does not detract from the court's construction of the pertinent statutes.

Plaintiff urges that this decision is now binding on this court. It is not binding but it does supply strong evidence in ascertaining the rule of decision of the Colorado Supreme Court. See Fidelity Union Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109. In B. F. Goodrich Co. v. Hammond, (10 Cir., 1959) 269 F.2d 501, 506, the Court of Appeals expressed it as follows:

"* * * [W]here jurisdiction rests solely on diversity of citizenship and there is no controlling decision by the highest court of a state, a decision by an intermediate court should be followed by the Federal court, absent, as here, of convincing evidence that the highest court of the state would decide otherwise."

No convincing evidence has been furnished nor has any been discovered to show that the Supreme Court of Colorado would adopt a view different from that adopted by the District Court of Dolores County. Indeed, the evidence supports the decision.

First of all, there is little ambiguity in the statutes themselves. A fair reading of them in their entirety would generate the conclusion that iron pyrite does not belong in the precious, or valuable mineral category. Secondly, when the nature of iron pyrite is considered it appears less likely that it could fit in the precious metal classification. This material is sometimes called "fool's gold." It is very rarely mined for the benefit of the iron which it contains. Furthermore, it is very rarely mined for its sulphide content and this is feasible only when its occurrences are such as to make it economically expedient to extract it for this purpose. See Dana, Minerals and How to Study Them, pp. 152, 154, third edition, 1953. Moreover, the precious metals occur in narrow and unpredictable quantities and values. The veins are sometimes narrow and sometimes wide, whereas pyrite occurs in much larger quantity. See Tippit, Taxation of

Mineral Interests, second annual Rocky Mountain Mineral Law Institute, pp. 435, 464.

In the case at bar Mr. Hinkley testified that the veins of pyrite are as wide as 32 feet and that it is not economical to mine them unless the vein is at least 6 or 7 feet in thickness. He also testified that the deposit is a bedded type, like coal. The pyrite is present with some semblance of regularity unlike the spotty occurrences of precious metal.

The plaintiff's operation would appear to be rather unique in that they have discovered an economic use for iron pyrite, and thus they mine it for this purpose. Undoubtedly, the deposits in the Rico area are unusually consistent.

The defendants take the position that the decision of the District Court for Dolores County should not be here persuasive since different methods are employed by the assessor in evaluating the pyrite in the years in question as opposed to 1961 when the decision was handed down. This fact is not important however, because in each instance the assessor at least purported to proceed under section 137–5–4, supra.

The fact that the claims which produce the iron pyrite are contiguous to deposits of gold, silver, lead and zinc; that they are all part of the Argentine and Mountain Springs claims, and that they are served by one tunnel, the St. Louis, does not change the fact that the plaintiff here is shown to mine pyrite for its own purposes and thus there is no escape from the proposition that section 137–5–9, supra, comes into play.

Since no reason, either in law or in equity, is apparent for treating the pyrite in what appears to this Court to be the plain words of the statute, it must be concluded that the action of the assessor and of the Board of County Commissioners was illegal and erroneous and that therefore plaintiff is entitled to relief under C.R.S.1953, section 137–12–15.

It is the judgment of the Court that the plaintiff have judgment for the amount of the taxes which it paid under protest attributable to the assessment on iron pyrite for the years 1959 and 1960. Plaintiff's attorneys will prepare a judgment responsive to this opinion, based upon a stipulation with the defendants as to the amount of the judgment. In all other respects the demands of the plaintiff are hereby found and concluded to be without merit and the motion of the defendants to dismiss these claims should be, and the same is hereby granted.